# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SONIA DUFFY, Derivatively on Behalf of CVS HEALTH CORPORATION,<br><br>        Plaintiff,<br><br>    v.<br><br>KAREN S. LYNCH, SHAWN M. GUERTIN, THOMAS F. COWHEY, FERNANDO AGUIRRE, JEFFREY R. BALSER, C. DAVID BROWN II, ALECIA A. DECOUDREAUX, NANCY-ANN M. DEPARLE, ROGER N. FARAH, ANNE M. FINUCANE, J. SCOTT KIRBY, MICHAEL F. MAHONEY, JEAN-PIERRE MILLON and MARY L. SCHAPIRO,<br><br>        Defendants,<br><br> and,<br><br>CVS HEALTH CORPORATION,<br><br>        Nominal Defendant. | Case No:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff, by and through her undersigned counsel, derivatively on behalf of CVS Health Coporation ("CVS" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from May 3, 2023 through April 30, 2024 (the "Relevant Period") and have caused substantial harm to the Company.

## JURISDICTION

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9) and Sections 10(b) of the Exchange Act (15. U.S.C. § 78j(b)).

3.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

4.      This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

5.      The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Rhode Island or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous

activities that had an effect in this District and CVS's principal executive offices are located at One CVS Drive, Woonsocket, Rhode Island 02895.

7.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

## THE PARTIES

**Plaintiff**

8.     Plaintiff is, and was at relevant times, a shareholder of the Company.   Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff has been a shareholder as early as January 2023.  Plaintiff is a citizen of Michigan.

**Nominal Defendant**

9.     ***Nominal Defendant CVS*** is a Delaware with principal executive offices located at One CVS Drive, Woonsocket, Rhode Island 02895. CVS's common stock trades in an efficient market on the NYSE under the ticker symbol "CVS".  Nominal Defendant is a citizen of Rhode Island.

**Director Defendants**

10.     ***Defendant Karen S. Lynch*** ("Lynch") has served as the Company's Chief Executive Officer ("CEO") at all relevant times.  Defendant Lynch also serves as a member of the Executive Committee.  Defendant Lynch also served as the EVP of CVS Health and President of Aetna from 2015 until taking on the role of CEO in 2021.  Pursuant to the proxy statement that the

3

Company filed with the SEC on April 5, 2024 (the "2024 Proxy Statement"), as of March 18, 2024, Defendant Lynch beneficially owned 1,623,815 shares of the Company's common stock.

11.    Further, For the 2023 Fiscal Year, Defendant Lynch received $21,615,034 in total compensation from the Company, including $1,500,000 in salary, $12,374,971 in stock awards, $4,124,992 in option awards, $2,992,000 in non-equity incentive plan compensation, and $623,071 in all other compensation.  Upon information and belief, Defendant Lynch is a citizen of Rhode Island.

12.    ***Defendant Shawn M. Guertin*** ("Guertin") served as the Company's Chief Financial Officer ("CFO") from prior to the start of the Relevant Period until October 2023.  In May 2024, Defendant Guertin officially left the Company.  Pursuant to the 2024 Proxy Statement, as of March 18, 2024, Defendant Guertin beneficially owned 207,132 shares of the Company's common stock.

13.    For the 2023 Fiscal Year, Defendant Guertin received $12,494,134 in total compensation from the Company, including $989,583 in salary, $7,499,980 in stock awards, $2,499,999 in option awards, $1,439,000 in non-equity incentive plan compensation, and $65,572 in all other compensation.  Upon information and belief, Defendant Guertin is a citizen of Connecticut.

14.    ***Defendant Thomas F. Cowhey*** ("Cowhey") as served as the Company's Chief Financial Officer ("CFO") since October 2023.  Defendant Cowhey served as CVS's Interim CFO from October 2023 until his appointment as EVP and CFO in January 2024.  Pursuant to the 2024 Proxy Statement, as of March 18, 2024, Defendant Cowhey beneficially owned 51,740 shares of the Company's common stock.

15.    For the 2023 Fiscal Year, Defendant Cowhey received $4,579,937 in total compensation from the Company, including $771,250 in salary, $2,187,397 in stock awards, $562,490 in option awards, $788,000 in non-equity incentive plan compensation, $2,095 in change in pension value and nonqualified deferred compensation earnings, and $268,705 in all other and $268,705 in all other compensation.  Upon information and belief, Defendant Cowhey is a citizen of Tennessee.

16.    **Defendant Fernando Aguirre** ("Aguirre") has served as a director of the Company since November 2018.  Defendant Aguirre also served as the Chair of the Audit Committee and a member of the Management Planning and Development Committee and the Executive Committee.  Defendant Aguirre also previously served as a member of the Executive Committee.  Pursuant to the 2024 Proxy Statement, as of March 18, 2024, Defendant Aguirre beneficially owned 32,844 shares of the Company's common stock.

17.    For the 2023 Fiscal Year, Defendant Aguirre received $318,167 in total compensation from the Company, including $87,932 in fees earned and paid in cash and $230,235 in stock awards.  Upon information and belief, Defendant Aguirre is a citizen of Florida

18.    **Defendant Jeffrey R. Balser** ("Balser") has served as a director of the Company since September 2022.  Defendant Basler also serves as a member of the Audit Committee and the Health Services and Technology Committee.   Pursuant to the 2024 Proxy Statement, as of March 18, 2024, Defendant Balser beneficially owned 5,093 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $77.57, Defendant Balser owned approximately $395,064 worth of CVS stock as of that date.

19.    For the 2023 Fiscal Year, Defendant Balser received $301,500 in total compensation from the Company, including $83,778 in fees earned and paid in cash and $217,722 in stock awards.  Upon information and belief, Defendant Balser is a citizen of Tennessee.

20.    **Defendant C. David Brown II** ("Brown") has served as a director of the Company since March 2007.  Defendant Brown also serves as the chair of the Management Planning and Development Committee and a member of the Nominating and Corporate Governance Committee and the Executive Committee.  According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Brown beneficially owned 198,310 shares of the Company's common stock.

21.    For the 2023 Fiscal Year, Defendant Brown received $321,500 in total compensation from the Company, including $88,750 in fees earned and paid in cash and $232,750 in stock awards.  Upon information and belief, Defendant Brown is a citizen of Florida.

22.    **Defendant Alecia A. DeCourdreaux** ("DeCourdreaux") has served as a director of the Company since March 2015.  Defendant DeCourdreaux also serves as a member of the Health Services and Technology Committee and the Nominating and Corporate Governance Committee.  According to the 2024 Proxy Statement, as of March 18, 2024, Defendant DeCoudreaux beneficially owned 32,432 shares of the Company's common stock.

23.    For the 2023 Fiscal Year, Defendant DeCoudreaux received $301,500 in total compensation from the Company, including $83,750 in fees earned and paid in cash and $217,750 in stock awards.   Upon information and belief, Defendant DeCoudreaux is a citizen of Massachusetts.

24.    **Defendant Nancy-Ann M. DeParle** ("DeParle") has served as a director of the Company since September 2013.  She also serves as the chair of the Nominating and Corporate

6

Governance Committee and a member of the Health Services and Technology Committee and the Executive Committee.  Pursuant to the 2024 Proxy Statement, as of March 18, 2024, Defendant DeParle beneficially owned 33,035 shares of the Company's common stock.

25.     For the 2023 Fiscal Year, Defendant DeParle received $321,500 in total compensation from the Company, including $88,826 in fees earned and paid in cash and $232,674 in stock awards.  Upon information and belief, Defendant DeParle is a citizen of Maryland.

26.     **_Defendant Roger N. Farah_** ("Farah") has served as a director of the Company since November 2018.  Defendant Farah also serves as the chair of the Executive Committee and a member of the Management Planning and Development Committee and the Nominating and Corporate Governance Committee.  Pursuant to the 2024 Proxy Statement, as of March 18, 2024, Defendant Farah beneficially owned 34,030 shares of the Company's common stock.

27.     For the 2023 Fiscal Year, Defendant Farah received $576,500 in total compensation from the Company, including $152,500 in cash fees elected to be paid in stock and $424,000 in stock awards.  Upon information and belief, Defendant Farah is a citizen of New York.

28.     **_Defendant Anne M. Finucane_** ("Finucane") has served as a director of the Company since January 2011.  Defendant Finucane also serves as a member of the Audit Committee and the Management Planning and Development Committee.  Pursuant to the 2024 Proxy Statement, as of March 18, 2024, Defendant Finucane beneficially owned 39,905 shares of the Company's common stock.

29.     For the 2023 Fiscal Year, Defendant Finucane received $321,500 in total compensation from the Company, including $88,826 in fees earned and paid in cash and $232,674 in stock awards.  Upon information and belief, Defendant Finucane is a citizen of Massachusetts.

30.    **Defendant J. Scott Kirby** ("Kirby") has served as a director of the Company since October 2023.  Defendant Kirby also serves as a member of the Health Services and Technology Committee.  Pursuant to the 2024 Proxy Statement, as of March 18, 2024, Defendant Kirby beneficially owned 2,721 shares of the Company's common stock.

31.    For the 2023 Fiscal Year, Defendant Kirby received $195,417 in total compensation from the Company, including $7,108 in fees earned and paid in cash, $41,875 in cash fees elected to be paid in stock, and $146,434 in stock awards.  Upon information and belief, Defendant Kirby is a citizen of Illinois.

32.    **Defendant Michael F. Mahoney** ("Mahoney") has served as a director of the Company since November 2023.  According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Mahoney beneficially owned 2,202 shares of the Company's common stock.

33.    For the 2023 Fiscal Year, Defendant Mahoney received $167,500 in total compensation from the Company, including $41,891 in fees earned and paid in cash and $125,609 in stock awards.  Upon information and belief, Defendant Mahoney is a citizen of Massachusetts.

34.    **Defendant Jean-Pierre Millon** ("Millon") has served as a director of the Company since March 2007.  Defendant Millon also serves as the chair of the Health Services and Technology Committee and a member of the Audit Committee.  Pursuant to the 2024 Proxy Statement, as of March 18, 2024, Defendant Millon beneficially owned 107,703 shares of the Company's common stock.

35.    For the 2023 Fiscal Year, Defendant Millon received $321,500 in total compensation from the Company, including $88,826 in fees earned and paid in cash and $232,674 in stock awards.  Upon information and belief, Defendant Millon is a citizen of Arizona.

36.     ***Defendant Mary L. Schapiro*** ("Schapiro") has served as a director of the Company since May 2017.  Defendant Schapiro also serves as the chair of the Investment and Finance Committee and a member of the Audit Committee, the Investment and Finance Committee and the Health Services and Technology Committee.  Pursuant to the 2024 Proxy Statement, as of March 18, 2024, Defendant Schapiro beneficially owned 29,738 shares of the Company's common stock.

37.     For the 2023 Fiscal Year, Defendant Schapiro received $301,500 in total compensation from the Company, including $83,750 in fees earned and paid in cash and $217,750 in stock awards.  Upon information and belief, Defendant Schapiro is a citizen of Washington, D.C.

38.     Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Mahoney, Millon, and Schapiro.

39.     The Director Defendants and Defendants Guertin and Cowkey are collectively referred to herein as the "Individual Defendants."

40.     CVS, and the Individual Defendants are collectively referred to herein as "Defendants."

## FACTS

### Background

41.     CVS is a healthcare company that operates through three primary segments: Health Care Benefits, Health Services, and Pharmacy & Consumer Wellness.  The Health Care Benefits segment purportedly offers "a broad range of traditional, voluntary and consumer-directed health insurance products and related services, including medical, pharmacy, dental and behavioral health

plans, medical management capabilities, Medicare Advantage and Medicare Supplement plans,

[PDPs] and Medicaid health care management services." The Health Care Benefits segment's

revenues consist almost entirely of insurance premiums paid by customers.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

42.    On May 3, 2023, the Company issued a press release reporting the Company's Q1

2023 results. The press release stated:

- Revised GAAP diluted EPS guidance range to $6.90 to $7.12 from $7.73 to

  $7.93

- Revised Adjusted Guidance range to $8.50 to $8.70 from $8.70 to $8.90

***

"We delivered another strong quarter while executing on the strategy we outlined
in December 2021, leading to the close of the Signify Health acquisition followed
quickly by Oak Street Health. These additions are core to our strategy and will help
unlock future growth as we push further into value-based care, which prioritizes
keeping people healthy."

43.    That same day, the Company filed a Quarterly Report on Form 10-Q with the SEC,

reporting the Company's financial and operational results for the quarter ended March 31, 2023

(the "Q1 2023 10-Q"). In providing an overview of the Company, the Q1 2023 10-Q stated:

CVS [. . .] is a leading diversified health solutions company reshaping health care
to help make healthier happen for more Americans. In an increasingly connected
and digital world, CVS Health is meeting people wherever they are and changing
health care to meet their needs. The Company has more than 9,000 retail locations,
more than 1,100 walk-in medical clinics, a leading pharmacy benefits manager with
over 110 million plan members with expanding specialty pharmacy solutions and a
dedicated senior pharmacy care business serving more than one million patients per
year. The Company also serves an estimated 37 million people through traditional,
voluntary and consumer-directed health insurance products and related services,
including expanding Medicare Advantage offerings and a leading standalone
Medicare Part D [PDP]. The Company is a leader in key segments of health care

through its foundational businesses and is creating new sources of value by expanding into next generation care delivery and health services, with a goal of improving satisfaction levels for both providers and consumers. The Company believes its integrated health care model increases access to quality care, delivers better health outcomes and lowers overall health care costs.

44.    In providing an overview of the Company's Health Care Benefits segment, the Q1 2023 10-Q stated:

The Health Care Benefits segment operates as one of the nation's leading diversified health care benefits providers. The Health Care Benefits segment has the information and resources to help members, in consultation with their health care professionals, make more informed decisions about their health care. The Health Care Benefits segment offers a broad range of traditional, voluntary and consumer-directed health insurance products and related services, including medical, pharmacy, dental and behavioral health plans, medical management capabilities, Medicare Advantage and Medicare Supplement plans, PDPs and Medicaid health care management services. The Health Care Benefits segment's customers include employer groups, individuals, college students, part-time and hourly workers, health plans, health care providers ("providers"), governmental units, government-sponsored plans, labor groups and expatriates. The Company refers to insurance products (where it assumes all or a majority of the risk for medical and dental care costs) as "Insured" and administrative services contract products (where the plan sponsor assumes all or a majority of the risk for medical and dental care costs) as "ASC." In addition, effective January 2022, the Company entered the individual public health insurance exchanges ("Public Exchanges") in eight states through which it sells Insured plans directly to individual consumers. The Company entered Public Exchanges in four additional states effective January 2023.

45.    In its discussion of current trends, the Q1 2023 10-Q stated:

We also face trends and uncertainties specific to our reportable segments, certain of which are summarized below and also discussed in the review of our segment results. For the remainder of the year, the Company believes you should consider the following important information:

- ***The Health Care Benefits segment is expected to continue to benefit from Medicare and Commercial membership growth,*** partially offset by declines in Medicaid due to impact of redeterminations in 2023.[1]

---

[1]    All emphases included herein are added unless otherwise indicated.

46.     Appended to the Q1 2023 10-Q as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Lynch and Guertin, attesting that "the information contained in the [Q1 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

47.     That same day, the Company hosted an earnings call with investors and analysts to discuss the Company's Q1 2023 results (the "Q1 2023 Earnings Call"). During the scripted portion of the Q1 2023 Earnings Call, Defendant Lynch stated:

> We are purposely executing on our strategy as we continue to expand our health platform of capabilities to serve a broader customer and consumer base. We are addressing the total cost of care, improving health, and expanding access to affordable quality care. Today we are announcing changes to our operating model and financial reporting that more accurately reflect how our businesses are managed. These changes allow us to be more nimble in our execution and more innovative when expanding our products and services. We are excited about accelerating our momentum by unlocking long-term value across our businesses and the broader healthcare marketplace.

48.     Defendants made false and/or misleading statements and/or failed to disclose that: (i) the forecasts CVS used to determine plan premiums were ineffective at accounting for medical cost trends and health care utilization patterns; (ii) as a result, CVS was likely to incur significant expenses to cover cost increases that were not accounted for in the Company's forecasts and thus not covered by plan premiums; (iii) accordingly, CVS had overstated the profitability of its Health Care Benefits segment; (iv) contrary to Defendants' assurances, the revenues generated from the Company's other primary segments were insufficient to offset the negative financial impact of the increasing expenditures within the Health Care Benefits segment; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

12

49.     On August 2, 2023, the Company issued a press release announcing the Company's Q2 2023 results.  The press release revealed that the Company was revising its diluted EPS guidance range to $6.53 to $6.75 from $6.90 to $7.12.  In the Q2 2023 10-Q filed that same day, CVS stated:

*Operating income*

- ***Operating income decreased $1.4 billion, or 30.7%, in the three months ended June 30, 2023 compared to the prior year primarily due to declines in the Health care Benefits segment,*** including the absence of the $225 million pre-tax gain on the sale of PayFlex recorded in the prior year, and the Pharmacy & Consumer Wellness segment, as well as a restructuring charge and acquisition-related transaction and integration costs recorded in the current year.

50.     On this news, the Company's stock price fell $2.04 per share, or 2.73%, to close at $72.32 per share on August 3, 2023.  The Company's securities nonetheless continued to trade at artificially inflated prices throughout the remainder of the Relevant Period because of Defendants' continued misstatements and omissions regarding the true scope and severity of the ineffectiveness of the Company's forecasts and the resulting negative financial impact.

51.     For example, the Q2 2023 10-Q contained substantively similar positive descriptions of the Company and its Health Care Benefits segment as discussed, *supra.*  In addition, with respect to current trends, the Q2 2023 10-Q stated:

The Health Care Benefits segment is expected to experience higher than previously expected medical cost trend in Medicare Advantage for the remainder of 2023, while expected medical cost trends remain consistent with pricing in Commercial and Medicaid. ***The segment is expected to benefit from continued membership growth in Commercial***, primarily related to the individual exchange business.

52.     Appended to the Q2 2023 10-Q as exhibits were signed certifications pursuant to SOX by Defendants Lynch and Guertin, attesting that "the information contained in the [Q2 2023

13

10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

53.     Also, on August 2, 2023, the Company hosted an earnings call with investors and analysts to discuss the Company's Q2 2023 results (the "Q2 2023 Earnings Call").  During the scripted portion of the Q2 2023 Earnings Call, Defendant Lynch stated, in relevant part:

> Tuning to our performance highlights for the quarter, in our healthcare benefits segment, we grew revenues to $26.7 billion, an increase of nearly 18%, and delivered adjusted operating income of $1.5 billion. Medical membership in the second quarter was 25.6 million, an increase of 1.2 million members versus the prior year, reflecting broad-based growth including individual exchange, Medicare and commercial membership. For our core commercial membership, this quarter marks the eighth consecutive quarter of membership gains. This growth reflects our differentiated product offerings that address the total cost of care and the whole health of a member through our integrated solutions.
>
> Medical cost trends were well controlled in our commercial and Medicaid books of business. Consistent with the broader industry, elevated medical costs emerged in our Medicare Advantage business which became apparent in the latter part of the quarter. The primary driver of these elevated medical costs was greater than expected utilization in outpatient settings.
>
> ***
>
> ***This quarter, we were able to offset the pressures in our healthcare benefits segment with continued strong execution in our health services segment***. Revenues grew to $46.2 billion, an increase of nearly 8%. Adjusted operating income grew 3.5% to $1.9 billion. These results were driven by our pharmacy services business. ***We consistently demonstrate value to consumers and our clients by successfully managing drug cost trends and bringing innovative clinical solutions to the market***.

54.     Later during the scripted portion of the Q2 2023 Earnings Call, Defendant Guertin stated:

> Turning now to our outlook for 2023, we are reaffirming our adjusted earnings per share guidance of $8.50 to $8.70. This guidance reflects our performance through the second quarter as well as a higher than expected Medicare Advantage medical

14

cost trend for the remainder of 2023, ***offset by strength in our pharmacy services business within our health service segment***.

55.     Defendants made false and/or misleading statements and/or failed to disclose that: (i) the forecasts CVS used to determine plan premiums were ineffective at accounting for medical cost trends and health care utilization patterns; (ii) as a result, CVS was likely to incur significant expenses to cover cost increases that were not accounted for in the Company's forecasts and thus not covered by plan premiums; (iii) accordingly, CVS had overstated the profitability of its Health Care Benefits segment; (iv) contrary to Defendants' assurances, the revenues generated from the Company's other primary segments were insufficient to offset the negative financial impact of the increasing expenditures within the Health Care Benefits segment; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

56.     On November 1, 2023, the Company issued a press release announcing the Company's Q3 2023 results.  The press release revealed that the Company was again reducing its diluted EPS guidance range to $6.37 to $6.61 from $6.53 to $6.75. In the Q3 2023 10-Q filed that same day, CVS stated, in relevant part:

*Operating Income*

- Operating income increased $6.1 billion, or 141.4%, in the nine months ended September 30, 2023 compared to the prior year. The increase in operating income was primarily driven by the absence of $5.7 billion in opioid litigation charges recorded in the prior year and increases in the Pharmacy and Consumer Wellness segment, primarily driven by the absence of the $2.5 billion loss on assets held for sale recorded in the prior year related to the write-down of the LTC business which was partially offset by continued pharmacy reimbursement pressure and decreased COVID-19 vaccinations and diagnostic testing compared to the prior year. ***These increases in operating income were partially offset by declines in the Health Care Benefits segment***, including the absence of the $225 million pre-tax gain on the sale of PayFlex recorded in the prior year, as

15

well as the restructuring charges and acquisition-related transaction and integration costs recorded in the current year.

57.    The Company securities nonetheless continued to trade at artificially inflated prices throughout the remainder of the Relevant Period because of Defendants' continued misstatements and omissions regarding the true scope and severity of the ineffectiveness of the Company's forecasts and the resulting negative financial impact.

58.    For example, the Q3 2023 10-Q contained substantively similar positive descriptions of the Company and its Health Care Benefits segment as discussed, *supra*, and appended to the Q2 2023 10-Q as exhibits were signed certifications pursuant to SOX by Defendants Lynch and Cowhey, attesting that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

59.    That same day, the Company hosted an earnings call with investors and analysts to discuss the Company's Q3 2023 results (the "Q3 2023 Earnings Call").  During the scripted portion of the Q3 2023 Earnings Call, Defendant Lynch stated:

> And once again, we generated outstanding operating cash flows, bringing our year-to-date total to $16.1 billion. We are reconfirming our guidance range for 2023 adjusted EPS of $8.50 to $8.70, ***this reflects execution against our strategy with strong performance in our Pharmacy & Consumer Wellness segment and continued momentum in our Health Services segment, offsetting incremental Medicare Advantage medical cost pressures in our Health Care Benefits segment***.

> Medicare Advantage is a key strategic growth area for our business. While it's still early in the 2024 annual enrollment period, we are confident that our competitive offering and attractive benefit design will meet consumer expectations. Aetna continues to be a leader in zero-dollar premium product and approximately 84% of Medicare eligibles will have access to Aetna plans in this category in 2024.

*** 

16

Let's turn to our performance in the quarter. In our Health Care Benefits segment, we grew revenues to more than $26 billion, an increase of nearly 17% and delivered adjusted operating income of $1.5 billion. Medical membership in the third quarter grew to 25.7 million, an increase of 1.4 million members versus the prior year, reflecting growth across multiple product lines, including individual exchange, Medicare and commercial.

We continue to experience elevated utilization trends in our Medicare Advantage business, primarily in outpatient and supplemental benefits such as dental, behavioral health, OTC and flex card. Given the elevated cost trends that have emerged this year, we are executing on plans to unlock additional revenue, clinical and network opportunities to help alleviate these pressures.

60.    Also, during the scripted portion of the Q3 2023 Earnings Call, Defendant Cowhey stated:

Our Medical Benefit ratio of 85.7% increased 230 basis points from the prior year quarter, primarily reflecting lower prior period development as well as higher Medicare Advantage utilization inside the quarter. Utilization pressure was primarily attributable to the categories [Defendant Lynch] highlighted earlier, including outpatient and supplemental benefits such as dental, behavioral health, OTC and flex cards.

Further, we also experienced individual exchange growth in the special enrollment period that exceeded our expectations. These members, particularly when added late in the year, will drive a higher MBR. As a result, our higher individual exchange growth is also contributing to our updated MBR guidance for the full year. We continue to closely watch utilization trends in our other lines of business.

But at this stage, we have not observed any other trends that we would consider inconsistent with our total expectations. Days claims payable at the end of the quarter was 50.3, up 3.4 days sequentially and reserve growth exceeded premium growth sequentially. Overall, we remain confident in the adequacy of our reserves.

61.    Defendants made false and/or misleading statements and/or failed to disclose that:

(i) the forecasts CVS used to determine plan premiums were ineffective at accounting for medical

cost trends and health care utilization patterns; (ii) as a result, CVS was likely to incur significant

expenses to cover cost increases that were not accounted for in the Company's forecasts and thus

not covered by plan premiums; (iii) accordingly, CVS had overstated the profitability of its Health

Care Benefits segment; (iv) contrary to Defendants' assurances, the revenues generated from the Company's other primary segments were insufficient to offset the negative financial impact of the increasing expenditures within the Health Care Benefits segment; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

62.     On February 7, 2024, the Company issued a press release announcing the Company's 2023 results.  The press release revealed that the Company was revising its diluted EPS guidance range to at least $7.06 from at least $7.26, its adjusted EPS guidance range to at least $8.30 from at least $8.50, and its cash flow from operations guidance to at least $12.0 billion from at least $12.5 billion.  In the 2023 10-K filed with the SEC that same day, CVS stated:

*Operating Income*

- Operating income increased $5.8 billion, or 72.8%, in 2023 compared to 2022. The increase in operating income was primarily driven by the absence of $5.8 billion of opioid litigation charges recorded in 2022 and increases in the Pharmacy & Consumer Wellness segment, primarily driven by the absence of a $2.5 billion loss on assets held for sale recorded in 2022 related to the write-down of the Company's Omnicare® long-term care business ("LTC business") which was partially offset by continued pharmacy reimbursement pressure and decreased COVID-19 vaccinations and diagnostic testing compared to 2022, as well as an increase in the Health Services segment. ***These increases in operating income were partially offset by declines in the Health Care Benefits segment***, including the absence of the $250 million pre-tax gain on the sale of bswift and the $225 million pre-tax gain on the sale of PayFlex recorded in 2022, as well as the restructuring charges and acquisition-related transaction and integration costs recorded in 2023.

63.     Moreover, in the Q4 2023 Earnings Call held that same day, Defendant Cowhey stated, in relevant part, that "we now expect adjusted operating income for the Healthcare Benefit segment to be at least $5.4 billion, a decrease of $370 million from our prior estimates."

64.    On this news, the Company's stock price fell $0.96 per share, or 1.27%, to close at $74.36 per share on February 8, 2024.  The Company securities nonetheless continued to trade at artificially inflated prices throughout the remainder of the Relevant Period because of Defendants' continued misstatements and omissions regarding the true scope and severity of the ineffectiveness of the Company's forecasts and the resulting negative financial impact.

65.    For example, the 2023 10-K contained substantively similar positive descriptions of the Company and its Health Care Benefits segment as discussed, *supra* and appended to the 2023 10-K as exhibits were signed certifications pursuant to SOX by Defendants Lynch and Cowhey, attesting that "the information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

66.    In addition, that same day, during the scripted portion of the Q4 2023 Earnings Call, Defendant Lynch stated:

> While the Medicare Advantage market has been challenged recently, our view of the long-term opportunity offered by this business remains unchanged. As we discussed in December, we are committed to achieving our targeted 4% to 5% margin in Medicare Advantage over time and we will begin that journey in 2025. At CVS Health, we have both the scale to transform how healthcare is delivered, and the ability to personalize care and coverage for each individual we serve. By bringing together the powerful capabilities of our brands, including Aetna, CVS Pharmacy, CVS Health Buyer and Caremark, we can deliver significant value to the customers and communities we serve and unlock tremendous potential for our shareholders.
>
> ***
>
> I'll now turn to the highlights from each of our businesses in the quarter. In our healthcare benefits segment, we continue to navigate through elevated utilization trends in our Medicare Advantage business. In the quarter, we grew revenues to nearly $27 billion, an increase of over 16%, and delivered adjusted operating income of $676 million, medical membership ended the year at 25.7 million an increase of 1.3 million members versus the prior year reflecting growth across multiple product lines, including individual exchange, Medicare and commercial. Medicare Advantage is integral to the CVS Health Strategy, after a very successful

19

2024 annual enrollment period, we expect to add at least 800,000 new members in 2024.

67.    Defendants made false and/or misleading statements and/or failed to disclose that: (i) the forecasts CVS used to determine plan premiums were ineffective at accounting for medical cost trends and health care utilization patterns; (ii) as a result, CVS was likely to incur significant expenses to cover cost increases that were not accounted for in the Company's forecasts and thus not covered by plan premiums; (iii) accordingly, CVS had overstated the profitability of its Health Care Benefits segment; (iv) contrary to Defendants' assurances, the revenues generated from the Company's other primary segments were insufficient to offset the negative financial impact of the increasing expenditures within the Health Care Benefits segment; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

68.    In addition, throughout the Relevant Period, the Company's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required the Company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failure to disclose the damage that would result from its ineffectiveness in accounting for medical cost trends and health care utilization patterns when determining plan premiums violated Item 303 because this issue represented a known trend and uncertainty that was likely to have a material unfavorable impact on the Company's business and financial results.

**APRIL 5, 2024 PROXY STATEMENT**

69.     On April 5, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Ludwig, Mahoney, Millon, and Schapiro solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

70.     The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Mahoney, Millon and Schapiro to the Board; (2) ratify the selection of Deloitte as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve, on an advisory basis, the compensation of the Company's named executive officers; and (4) approve an amendment to the 2017 ICP to increase the number of common shares available under the 2017 ICP by 33,500,000 (the "2024 Amendment to the 2017 ICP").  As disclosed in the 2024 Proxy Statement, as of December 31, 2023, there were 11,000,000 shares of common stock remaining which were available to be issued under the 2017 ICP, with an additional 16,700,000 available under the Signify Health, Inc. 2021 Long-Term Incentive Pan, as amended (the "Signify Health Plan") and the Oak Street Health, Inc. Omnibus Incentive Plan, as amended (the "Oak Street Health Plan" together with the Signify Health Plan, the "Acquired Company Plans").

71.     The 2024 Proxy Statement noted that if the CVS shareholders approved the 2024 Amendment to the 2017 ICP, it would "increase the number of shares of common stock authorized to be issued under the 2017 ICP by 33.5 million, in order to permit the Company to continue to grant awards under the 2017 ICP."  Further, the 2024 Proxy Statement noted that approval of the 2024 Amendment to the 2017 ICP will "streamline the administration of incentive compensation

and ensure equal treatment for all eligible employees, the MP&D Committee recommended and the Board approved the termination of both Acquired Company Plans."

72.     Regarding "The Board's Role in Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

> The Board's role in risk oversight involves both the full Board and its committees, as well as members of management.
>
> **The Board's risk oversight function**:
>
> •     The Board focuses on understanding Company-wide risks and ensuring that risk matters are appropriately brought to the Board and/or its committees for review.
>
> •     The Board ensures that the Corporate Governance Guidelines, the Board's leadership structure and the Board's practices facilitate the effective oversight of risk and communication with management.
>
> •     The Board received regularly updates on specific risks in the course of its review of corporate strategy, business plans and reports to the Board by its respective committees.
>
> The Board considers its role in risk oversight when evaluating the Company's Corporate Governance Guidelines and the Board's leadership structure. Both the Corporate Governance Guidelines and the Board's leadership structure facilitate the Board's oversight of risk and communication with management. Our Independent Chair and our CEO are focused on CVS Health's and the Board's risk management efforts and ensure that risk matters are appropriately brought to the Board and/or its committees for their review.

73.     Regarding the Code of Conduct, the 2024 Proxy Statement stated the following, in relevant part:

> CVS Health has adopted a Code of Conduct that applies to all of our directors, officers and employees, including our CEO, CFO and Chief Accounting Officer. Our   Code   of   Conduct   is   available   on   our   website   at https://investors.cvshealth.com/investors/corporategovernance/ documents/default.aspx and will be provided to stockholders without charge upon request to our Corporate Secretary. We intend to post amendments to, or waivers of, our Code of Conduct (to the extent applicable to our executive officers or directors) at that location on our website within the timeframe required by SEC rules.

22

74.     Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Ludwig, Mahoney, Millon and Schapiro caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) CVS's forecasts used to set plan premiums failed to account for trends in medical costs and patterns in health care utilization; (2) due to the foregoing, the Company was likely to incur substantial expenses in order to cover cost increases that CVS's forecasts did not account for (and thus, that were not covered by plan premiums); (3) as such, the profitability of CVS's Health Care Benefits segment was overstated by Defendants; (4) despite the Individual Defendants' claims to the contrary, the Company's other segments did not generate sufficient revenues to offset the negative impact of the increased expenditures within the Health Care Benefits segment; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of an amendment to increase the number of shares available under the 2017 ICP; and (6) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

75.     The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct.  Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

76.    As a result of Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Ludwig, Mahoney, Millon and Schapiro causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Mahoney, Millon and Schapiro to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the selection of Deloitte as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve named executive officer compensation on an advisory, non-binding basis; and (4) approve the 2024 Amendment to the 2017 ICP.

77.    As a result of the shareholders approving the 2024 Amendment to the 2017 ICP, there were an additional 33,500,000 shares available for issuance under the Incentive Plan. The Individual Defendants, including many of whom are current directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the 2024 Amendment to the 2017 ICP. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2017 ICP in the future.

## THE TRUTH FULLY EMERGES

78.    On May 1, 2024, the Company issued a press release announcing the Company's Q1 2024 results and revising its full-year 2024 guidance.  The press release stated:

**2024 full-year guidance**

- Revised GAAP diluted EPS guidance to at least $5.64 from at least $7.06
- Revised Adjusted EPS guidance to at least $7.00 from at least $8.30

- Revised case flow from operations guidance to at least $10.5 billion from at least $12.0 billion

*** 

First quarter GAAP diluted EPS of $0.88 decreased from $1.65 in the prior year and Adjusted EPS of $1.31 decreased from $2.20 in the prior year, primarily due to a decline in the Health Care Benefits segment's operating results, reflecting utilization pressure in the Company's Medicare business.

Recognizing the potential for continued elevated medical cost trends in the remainder of 2024, the Company revised its full-year 2024 GAAP diluted EPS, Adjusted EPS and cash flow from operations guidance to reflect the assumption that the majority of this pressure will persist throughout 2024.

79.    Further, in the Q1 2024 10-Q filed with the SEC that same day, CVS stated:

*Operating income*

- Operating income decreased $1.2 billion, or 34.1%, in the three months ended March 31, 2024, ***primarily due to increased Medicare utilization, the unfavorable impact of the previously disclosed decline in the Company's 2024 Medicare Advantage star ratings and a year-over-year unfavorable impact from development of prior-years' health care cost estimates in the Health Care Benefits segment***, as well as continued pharmacy client price improvements, lower contributions from 340B and the previously announced loss of a large client in the Health Services segment. These decreases were partially offset by an increase in operating income in the Pharmacy & Consumer Wellness segment, including the absence of a $349 million loss on assets held for sale related to the write-down of the Company's Omnicare® long-term care business ("LTC business") recorded in the prior year.

80.    On this news, the Company's stock price fell $11.40 per share, or 16.84%, to close at $56.31 per share on May 1, 2024.

## CORPORATE GOVERNANCE

81.    As members of the Company's Board, the Director Defendants are required to follow the Company's Code of Ethics, its corporate governance guidelines and the charters of each committee of the Board of Directors.  Defendants failed to do so.

## DUTIES OF THE DIRECTOR DEFENDANTS

82.     As members of The Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

83.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

84.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

85.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

86.     To discharge their duties, the officers and directors of the Company were

required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

87.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

88.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## THE COMPANY'S CODE OF CONDUCT

89.     The Company's Code of Conduct "applies to everyone in the Company, including the Board of Directors and all colleagues." Additionally, the Code of Conduct "is intended to help resolve ethics and compliance issues by providing the information, tools and resources necessary to make good decisions."

90.     Under the heading "Financial integrity," the Code of Conduct states the following:

The Sarbanes-Oxley Act of 2002 (SOX) requires certain Company leaders to certify to the truth and accuracy of Company financial statements. SOX also mandates that we maintain appropriate financial controls, report significant fraud and keep detailed and accurate records of all our business operations. We will maintain

books, records and accounts that accurately reflect the business transactions and assets of CVS Health. If you have a role in public financial communications, make sure disclosures are full, fair, accurate, timely and understandable.

91.    Under the heading "Confidential and proprietary information," the Code of

Conduct states the following:

Confidential and proprietary information such as trade secrets (which may include certain Company policies and/or procedures), technological advances, customer lists, knowledge of acquisitions or divestitures and financial data are some of the Company's most valuable business assets. This includes information that might be of use to competitors or harmful to the Company or those we serve if disclosed to others. To determine whether or not information is proprietary, consider whether information that is handled or shared on the job might give our competitors an unfair advantage if disclosed to them.

92.    Under the heading "Conflicts of interest," the Code of Conduct states the following:

A "conflict of interest" may arise when personal interests or activities appear to improperly influence our ability to act in the best interests of the Company. Situations involving a conflict of interest may not always be obvious or easy to resolve.

93.    Under the heading "Disclosure of non-public material information," the Code of

Conduct states the following:

Colleagues and members of the Board of Directors are not permitted to make any disclosure of material, non-public information about the Company to any person or entity outside the Company unless the disclosure complies with the CVS Health Regulation FD Disclosure Policy, which is posted on the Company's intranet sites. If a colleague or member of the Board of Directors of CVS Health believes that a disclosure of material nonpublic information about the Company has occurred, they must immediately notify the General Counsel.

94.    Under the heading "Requests for information from the investment community," the

Code of Conduct states the following:

Colleagues and members of the Board of Directors are not permitted to speak with members of the investment community, including "brokers" or any persons attempting to arrange consultations, regarding any information about the Company unless it has been explicitly authorized in advance by our Investor Relations

Department. This prohibition includes the sharing of information about any issues relating to our Company, including our policies, procedures, operations, customer service or client service issues or positions/opinions on any issues concerning our business.

95.     Under the heading "Records retention and management," the Code of Conduct

states the following:

CVS Health works to ensure we handle and maintain all Company records in accordance with our Corporate Records Management Program where applicable, and provides colleagues, contingent workers and suppliers with direction and support in properly managing our records throughout their life cycle. Records used by professionals, such as pharmacists and nurses, must follow all regulatory and accreditation standards and requirements. We never destroy records subject to audit, pending investigation or pending litigation until the audit, investigation or litigation is completed, even if they have reached the end of the required retention period. We must always manage records according to our Corporate Records Management Program.

96.     Under the heading "Leadership responsibilities," the Code of Conduct states the

following:

While setting the tone at the top, CVS Health leadership must "walk the talk" and demonstrate the Company's Heart At Work Behaviors™ in all of their dealings on its behalf. CVS Health leaders are responsible for making strategic business decisions that align with our ethical standards and with this Code. CVS Health leaders, including Managers and Supervisors, must also be knowledgeable about the content and operation of the Compliance and Integrity Program. The leadership team plays an important role in building integrity, respect, credibility and long-term sustainability for the Company. Because leadership sets an example for all colleagues, they must:

• Maintain a positive, ethical work environment;
• Make certain that colleagues understand what is expected of them both professionally and ethically;
• Maintain an open-door policy on a routine basis for colleagues to ask questions and raise concerns;
• Address issues raised by colleagues by listening and taking action, when appropriate;
• Ensure colleagues complete all training in a timely manner;

- Address all reports of misconduct and never ignore misconduct or retaliation;
- Reinforce this Code with colleagues;
- Immediately report any incidents of workplace harassment or retaliation;
- Communicate all policies and procedures;
- Be fair and objective; and
- Be a positive role model.

## CORPORATE GOVERNANCE GUIDELINES

97.     CVS represents that its Corporate Governance Guidelines were adopted "to promote a high level of performance from the Board and management, to promote the interests of stockholders and to further the Company's commitment to best practices in corporate governance."

98.     Under the heading "Director Responsibilities," the Corporate Governance Guidelines state:

> The Board acts as the ultimate decision-making body of the Company and advises and oversees management, who are responsible for the day-to-day operations and management of the Company. In fulfilling this role, each director must act in what he or she reasonably believes to be in the best interests of the Company and must exercise his or her business judgment.

99.     Under a subheading in the same section titled "Company Performance and Corporate Strategy," the Corporate Governance Guidelines state:

> The Board reviews the Company's financial performance on a regular basis at Board meetings and through periodic updates, with a particular focus on peer and competitive comparisons. These reviews include the views of management as well as those of investors and securities analysts.  The Board also periodically reviews the Company's long-term strategy, and assesses its strategic, competitive and financial performance, on both an absolute basis and in relation to the performance, practices and policies of its peers and competitors.

100.    Under a section titled "Board Committees," the Corporate Governance Guidelines describe the role of the Audit Committee as:

the Audit Committee shall generally be responsible for overseeing the integrity of the Company's financial statements, its independent auditor, its internal audit function, compliance by the Company with legal and regulatory requirements and overseeing the Company's Code of Conduct.

101.    In violation of the Code of Conduct and Corporate Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof.  Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## AUDIT COMMITTEE CHARTER

102.    The Company also maintains an Audit Committee Charter (the "Audit Committee Charter").  According to the Audit Committee Charter, the purpose of the Audit Committee is to:

The Audit Committee (the "Committee") was created by the Board of Directors (the "Board") to:

- •    assist the Board in its oversight of:
  - o    the integrity of the financial statements of the Company;
  - o    the qualifications, independence, performance and engagement of the Company's independent registered public accounting firm (the "independent auditor");
  - o    the performance of the Company's internal audit function;
  - o    the policy standards and guidelines for risk assessment and risk management;
  - o    the Company's compliance program, including compliance with the Company's Code of Conduct; and

32

> o      compliance by the Company with legal and regulatory requirements; and

- prepare the Audit Committee Report to be included in the Company's annual proxy statement.

103.    The Audit Committee Charter, under the heading "Responsibilities," within the subsection titled "*General*," states that, "[t]he Committee will maintain open lines of communication with the Company's Chief Financial Officer (the "CFO"), CAE, CCO, and with the Company's independent auditors, each of whom will have free and direct access to the Committee. The CCO is authorized to communicate promptly and personally to the Committee on all matters that he or she deems appropriate."

104.    Under the same heading, in the subsection titled "Independent Auditor," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows:

- The Committee shall be directly responsible for the appointment, compensation, retention and oversight of the work of any accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attestation services for the Company (subject, if applicable, to shareholder ratification). Each such accounting firm shall report directly to the Committee.

- The Committee shall pre-approve the audit services and non-audit services to be provided by the Company's independent auditor pursuant to preapproval policies and procedures established by the Committee. The preapproval policies and procedures shall be periodically reviewed by the Committee. The Committee may delegate its authority to pre-approve services to one or more Committee members, provided that such designees present any such approvals to the full Committee at the next Committee meeting.

- The Committee shall discuss with the independent auditor its responsibilities under generally accepted auditing standards, review and approve the scope and staffing of the independent auditor's annual audit plan(s), with emphasis on accounting and financial areas where the Committee, management, or the accountants believe special attention

should be directed, and discuss any significant findings from the audit, including any problems or difficulties encountered.

- The Committee shall evaluate the independent auditor's qualifications, performance and independence, and shall present its conclusions with respect to the independent auditor to the full Board on at least an annual basis. As part of such evaluation, at least annually, the Committee shall:

  o   obtain and review a report or reports from the Company's independent auditor:

    ▪   describing the independent auditor's internal quality-control procedures;

    ▪   describing any material issues raised by (i) the most recent internal quality-control review, or peer review, of the independent auditor, or (ii) any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding one or more independent audits carried out by the independent auditor, and any steps taken to deal with any such issues;

    ▪   describing all relationships between the independent auditor and the Company consistent with the applicable requirements of the Public Company Accounting Oversight Board ("PCAOB") regarding the independent auditor's communications with the Committee concerning independence; and

    ▪   assuring that Section 10A of the Securities Exchange Act of 1934, as amended, has not been implicated;

  o   consider whether the provision of non-audit services is compatible with maintaining auditor independence;

  o   confirm, and evaluate the rotation of, the audit engagement team partners, review and evaluate the lead partner and consider whether rotation should occur more frequently, so as to assure continuing auditor independence;

  o   consider whether the independent auditor should be rotated, so as to assure continuing auditor independence; and

  o   obtain the opinion of management and the internal auditors of the independent auditor's performance.

- The Committee shall establish and periodically review the policies for the Company's hiring of current or former employees of the independent auditor.

34

105.    Under the same heading, in the subsection titled "*Internal Auditors*," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows:

- At least annually, the Committee shall evaluate the performance, responsibilities, budget and staffing of the Company's internal audit function and review the internal audit plan. Such evaluation shall include a review of the responsibilities, budget and staffing of the Company's internal audit function with the independent auditor.

- At least annually, the Committee shall review the annual internal audit plan with the senior officer or officers responsible for the internal audit function of the Company. The review shall focus on the scope and effectiveness of internal audit activities and the department's capability to fulfill its objectives.

- At least annually, the Committee shall review significant findings by the internal audit staff and management's responses to such findings and instances of remedial action not being taken by management within appropriate timeframes in response to any such findings, if any.

- At least annually, the Committee shall review the appointment, performance, reassignment or dismissal, and compensation of the CAE, who shall report directly to the Committee and administratively to the CFO of the Company.

106.    Under the same heading, in the subsection titled "*Financial Statements and Disclosure Matters; Capital Allocation*," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows:

- The Committee shall meet to review and discuss with management, the internal auditors and the independent auditor, in separate meetings if the Committee deems it appropriate:

  o   the annual audited financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to the filing of the Company's Form 10-K;

35

o    the quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to the filing of the Company's Form 10-Q;

o    analyses or other written communications prepared by management and/or the independent auditor setting forth significant judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements and estimates made by management having a material impact on the financial statements;

o    the critical accounting policies and practices of the Company;

o    critical audit matters disclosed in the independent auditor's reports;

o    off-balance sheet transactions and structures;

o    the Company's regulated capital investment portfolio; and

o    the effect of regulatory and accounting initiatives or actions applicable to the Company (including any SEC investigations or proceedings) and any significant accounting, reporting, regulatory and other developments affecting the Company's annual and quarterly financial statements, related footnotes and related disclosures.

• The Committee shall review, in conjunction with management, the Company's earnings press releases and to the type of financial information and earnings guidance provided to analysts and rating agencies, paying particular attention to the use of non-GAAP financial information.

• The Committee shall review, in conjunction with management, the financial and other metrics presented in the Company's environmental, social and governance ("ESG") disclosures included as part of the Company's reports to be filed with the SEC, along with the assurance processes and the internal and disclosure controls and procedures for such ESG disclosures.

• The Committee shall, in conjunction with the Chief Executive Officer (the "CEO") and CFO of the Company, at least annually, review and approve the Company's disclosure controls and procedures and also review the effectiveness of the Company's internal controls over financial reporting. The review of internal controls over financial reporting shall include

36

whether there are any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to affect the Company's ability to record, process, summarize and report financial information, and any fraud involving management or other employees with a significant role in internal control over financial reporting. The Committee shall also review any special audit steps adopted in light of material control deficiencies.

• The Committee shall review and discuss with the independent auditor any audit problems or difficulties and management's response thereto, including those matters required to be discussed with the Committee by the independent auditor pursuant to established auditing standards.

• The Committee shall establish and periodically review the procedures for:

    o    the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters, and

    o    the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters.

• The Committee shall review any complaints regarding accounting, internal accounting controls or auditing matters received pursuant to such procedures.

• The Committee shall prepare the Audit Committee Report that the SEC rules require to be included in the Company's annual proxy statement.

107. Under the same heading, in the subsection titled "*Risk Assessment, Risk Management and Compliance Matters*," the Audit Committee Charter states that the responsibilities of the Committee as follows:

• The Committee shall review, in conjunction with management, the independent auditor and the internal audit department, the Company's policies and practices and its implementation and effectiveness with respect to risk assessment and risk management of the Company's major risks, and the steps that have been taken to monitor, control and report such exposures.

• The Committee shall periodically review and approve and shall oversee compliance with the Company's Code of Conduct. The Committee shall also review and consider any requests for waivers of the Company's Code

of Conduct for the Company's directors, executive officers and other senior financial officers, and shall make a recommendation to the Board with respect to such request for a waiver.

- The Committee shall periodically review the Company's information governance framework, including the Company's privacy program and the cyber security aspects of its information security program. The Committee shall review significant cases of employee conflict of interest, misconduct, or fraud.

- As part of its oversight of the Company's compliance program, the Committee shall review the Company's compliance with laws and regulations, including major legal and regulatory matters, such as federal health care program requirements, consent decrees, corporate integrity agreements or similar obligations. In that regard, the Committee shall review and discuss, in conjunction with management, the implementation and effectiveness of CVS Health's compliance program, including the performance of the CCO. The Committee shall also review any litigation or investigations that may have a material impact on the Company's financial statements or accounting policies. The Committee shall meet with the CCO no less than four (4) times per year, and shall meet and discuss legal and regulatory matters with management and others as appropriate, including the General Counsel.

108.    Under the same heading, in the subsection titled "*Reporting to the Board*," the

Audit Committee Charter states that the responsibilities of the Committee as follows:

- The Committee shall report to the Board periodically and at least annually. These reports shall include a review of any recommendations or issues that arise with respect to the quality or integrity of the Company's financial statements, compliance with the Company's Code of Conduct, Company's compliance with legal or regulatory requirements, the independence and performance of the Company's independent auditor, the performance of the internal audit function and any other matters that the Committee deems appropriate or is requested to be included by the Board.

- At least annually, the Committee shall evaluate its own performance and the Chair of this Committee shall report to the Board on such evaluation.

- The Committee shall periodically review and assess the adequacy of this charter and recommend any proposed changes to the Board for approval.

109.    In violation of the Audit Committee Charter, the Individual Defendants (as key

officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

110.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

111.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

112.    Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

113.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth

throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

114.    The Company Board is currently comprised of twelve (12) members – including Defendants Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Lynch, Mahoney, Millon, and Schapiro. Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.,* six (6), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

115.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, and as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over *$764.4 million* for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.  Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

116.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

117.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

118.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

119.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

120.    The Director-Defendants solicited the 2024 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to CVS.

121.    In addition, the Director-Defendants caused the 2024 Proxy Statement to call for a shareholder vote to approve the 2024 Amendment to the Company's Long-Term Incentive Plan ("2017 ICP"), which increased the amount of shares available under the Incentive Plan by 33,500,000.  The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2024 Amendment to the 2017 ICP who would not have approved the 2024

41

Amendment to the 2017 ICP, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2024 Amendment to the 2017 ICP at the annual meeting of stockholders of CVS on May 16, 2024, 11,000,000 shares remained available for future issuance under the 2017 ICP, and 16,700,000 aggregate shares available under the Acquired Company Plans. After the shareholders approved the 2024 Amendment to the 2017 ICP, there were an additional 33,500,000 shares available for issuance under the amended 2017 ICP. The Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for from the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the 2024 Amendment to the 2017 ICP that increased the number of shares available under the 2017 ICP. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

**Defendant Lynch**

122.    Defendant Lynch not disinterested or independent, and therefore, is incapable of considering demand because he (as its president and CEO) is an employee of the Company who derives substantially all of his income from his employment with CVS, making him not independent. As such, Defendant cannot independently consider any demand to sue himself for breaching his fiduciary duties to CVS, because that would expose him to liability and threaten his livelihood. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Lynch is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, too, Defendant Lynch faces a substantial likelihood of liability, is not independent or disinterested, and thus

demand upon her is futile and, therefore, excused.

123.    Because of Defendant's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant is unable to comply with Defendant's fiduciary duties and prosecute this action.  Defendant is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself/herself in the securities fraud class action lawsuit *Nixon v. CVS Health Corporation* 1:24cv05303, brought under the Securities Exchange Act of 1934 (the "Securities Class Action").

**Defendant Aguirre**

124.    Defendant Aguirre has served as a Company director since November 2018.  He also serves as the Chair of the Audit Committee and a member of the Management Planning and Development Committee. Defendant Aguirre received and continues to receive handsome compensation for his role as a Company director.  Further, Defendant Aguirre solicited the 2024 Proxy Statement, which led to the reelection of Defendants Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Lynch, Mahoney, Millon, and Schapiro, and himself to the Board, allowing them to continue breaching their fiduciary duties and to the approval of the 2024 Amendment to the 2017 ICP.  As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Aguirre is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting

from the adoption of the 2024 Amendment to the 2017 ICP.  For these reasons, Defendant Aguirre breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Balser**

125.    Defendant Balser has served as a Company director since September 2022.  He also serves as a member of the Health Services and Technology Committee, the Audit Committee, and the Executive Committee.  Defendant Balser has received and continues to receive handsome compensation for his role as Company director.  In addition, Defendant Balser solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Lynch, Mahoney, Millon, and Schapiro, and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP.  As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Balser is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, too, Defendant Balser breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Brown**

126.    Defendant Brown has served as a Company director since March 2007.  Defendant Brown also serves as the Chair of the Management Planning and Development Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Brown has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Brown solicited the 2024 Proxy Statement, which led to the reelection of Defendants  Aguirre, Balser, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Lynch, Mahoney, Millon, and Schapiro, and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP.  As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Brown is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP.  For these reasons, Defendant Brown breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant DeCoudreaux**

127.    Defendant DeCoudreaux has served as a Company director since March 2015. She also serves as a member of the Health Services and Technology Committee and the Nominating

and Corporate Governance Committee.  Defendant DeCoudreaux has received and continues to receive handsome compensation for his role as a Company director.  In addition, Defendant DeCoudreaux solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser, Brown, DeParle, Farah, Finucane, Kirby, Lynch, Mahoney, Millon, and Schapiro, and herself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP.  As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.  Moreover, under the 2024 Amendment to the 2017 ICP, Defendant DeCoudreaux is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP.  For these reasons, too, Defendant DeCoudreaux breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**Defendant DeParle**

128.    Defendant DeParle has served as a Company director since September 2013. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Health Services and Technology Committee.  In addition, Defendant DeParle solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser, Brown, DeCoudreaux, Farah, Finucane, Kirby, Lynch, Mahoney, Millon, and Schapiro, and herself to the

Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP.  As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant DeParle is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, Defendant DeParle breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**Defendant Farah**

129.    Defendant Farah has served as a Company director since November 2018 and has served as Independent Chair of the Board since May 2022.  Defendant Farah also serves as the Chair of the Executive Committee and as a member of the Management Planning and Development Committee and the Nominating and Corporate Governance Committee. Defendant Farah has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Farah solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser, Brown, DeCoudreaux, DeParle, Finucane, Kirby, Lynch, Mahoney, Millon, and Schapiro, and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017

ICP. As a trusted-long time Company director and Independent Chair of the Board, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Farah is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, Defendant Farah breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Finucane**

130.    Defendant Finucane has served as a Company director since January 2011.  She also serves as a member of the Audit Committee and the Management Planning and Development Committee. Defendant Finucane has received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Finucane solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Kirby, Lynch, Mahoney, Millon, and Schapiro, and herself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP.  As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

48

Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Finucane is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, too, Defendant Finucane breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**Defendant Kirby**

131.    Defendant Kirby has served as a Company director since October 2023. Defendant Kirby also serves as a member of the Health Services and Technology Committee. Defendant Kirby has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Kirby solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser,Brown, DeCoudreaux, DeParle, Farah, Finucane, Lynch, Mahoney, Millon, and Schapiro, and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Kirby is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the

adoption of the 2024 Amendment to the 2017 ICP. For these reasons, too, Defendant Kirby breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Mahoney**

132.    Defendant Mahoney has served as a Company director since November 2023. Defendant Mahoney also serves as a member of the Management Planning and Development Committee and the Executive Committee. Defendant Mahoney has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Mahoney solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Lynch, Kirby, Millon, and Schapiro, and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP.  As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Mahoney is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, Defendant Mahoney breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Millon**

133.    Defendant Millon has served as a Company director since March 2007.  Defendant Milton also serves as the Chair of the Health Services and Technology Committee and as a member of the Audit Committee. Defendant Millon has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Millon solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Lynch, Kirby, Mahoney, and Schapiro, and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP.  As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Millon is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, too, Defendant Millon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Schapiro**

134.    Defendant Schapiro has served as a Company director since May 2017.  Defendant Schapiro also serves as a member of the Audit Committee and the Health Services and Technology

Committee. Defendant Schapiro has received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Schapiro solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Lynch, Kirby, Mahoney, and Millon, and herself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Schapiro is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, Defendant Schapiro breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**Defendants Aguirre, Finucane, Millon, Schapiro and Balser**

135. During the Relevant Period, Defendants Aguirre, Finucane, Millon, Schapiro, and Balser served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia,* overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, and

otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

136.    Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## FIRST CAUSE OF ACTION

### (Against The Director Defendants for Breach of Fiduciary Duties)

137.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

138.    The Director Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

139.    The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

140.    The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

141.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

142.    As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against The Individual Defendants for Gross Management)

143.    Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

144.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

145.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

146.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT III

**(Against the Director Defendants for Waste of Corporate Assets)**

147.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

149.    As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

150.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

151.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT IV

**(Against The Individual Defendants For Unjust Enrichment)**

152.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

153.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

154.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

155.    Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

156.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## **COUNT V**

### **(Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act)**

157.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

158.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

159.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

160.    Under the direction and watch of Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Ludwig, Mahoney, Millon, and Schapiro, the 2024 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

161.    The 2024 Proxy Statement also failed to disclose that: (i) CVS's forecasts used to set plan premiums failed to account for trends in medical costs and patterns in health care utilization; (ii) due to the foregoing, the Company was likely to incur substantial expenses in order to cover cost increases that CVS's forecasts did not account for (and thus, that were not covered by plan premiums); (iii) as such, the profitability of CVS's Health Care Benefits segment was overstated by Defendants; (iv) despite the Individual Defendants' claims to the contrary, the Company's other segments did not generate sufficient revenues to offset the negative impact of the increased expenditures within the Health Care Benefits segment; (v) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder

57

approval of an amendment to increase the number of shares available under the 2017 ICP; and (vi) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

162.    In exercise of reasonable care, Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Ludwig, Mahoney, Millon, and Schapiro should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to the re-election of Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Mahoney, Millon, and Schapiro to the Board and the approval of the 2024 Amendment to the 2017 ICP.

163.    The false and misleading elements of the 2024 Proxy Statement led to, among other things, the re-election of Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Mahoney, Millon, and Schapiro to the Board, which allowed them to continue to breach their fiduciary duties to the Company, and the approval of the 2024 Amendment to the 2017 ICP.

164.    The Company was damaged as a result of Defendants Lynch's, Aguirre's, Balser's, Brown's, DeCoudreaux's, DeParle's, Farah's, Finucane's, Kirby's, Ludwig's, Mahoney's, Millon's, and Schapiro's material misrepresentations and omissions in the 2024 Proxy Statement.

165.    Plaintiff, on behalf of CVS, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for Violations of
### Section 10(b) and Rule 10b-5 of the Exchange Act

166.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding CVS. Not only is CVS now defending claims that is violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon CVS by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase *39,702,374* of its own shares at artificially inflated prices, damaging CVS.

168.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

169.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about CVS not misleading.

170.    The Individual Defendants as top executives and directors acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

171.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgement as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.    Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' unjust enrichment;

D.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing

governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

      E.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 1, 2024

**MOTLEY RICE LLC**

By: _/s/ Vincent L. Greene_
    Vincent L. Greene
40 Westminster St., 5th Fl.
Providence, RI 02903
Telephone: (401) 457-7730
Facsimile: (401) 457-7708
Email: vgreene@motleyrice.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna (_pending pro hac vice_)
Gregory M. Egleston (_pending pro hac vice_)
260 Madison Ave., 22nd Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

_**Attorneys for Plaintiff**_